**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 22-1280, 22-1376

_____

EPSILON ENERGY USA, INC.,
                    Appellant in 22-1280
v.

CHESAPEAKE APPALACHIA, LLC
_____

EPSILON ENERGY USA, INC.

v.

CHESAPEAKE APPALACHIA, LLC,
                    Appellant in 22-1376
_____

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. No. 1-21-cv-00658)
District Judge: Honorable Jennifer P. Wilson
_____

Argued
January 25, 2023

_____

Before: HARDIMAN, KRAUSE, and MATEY, *Circuit Judges*.

(Filed: August 23, 2023)
_____

Matthew A. Fitzgerald **[ARGUED]**
McGuireWoods
800 E Canal Street
Gateway Plaza
Richmond, VA 23219

Gregory J. Krock
McGuireWoods
260 Forbes Avenue
Suite 1800
Pittsburgh, PA 15222

Elizabeth M. Thomas
McGuireWoods
201 N Tryon Street
Suite 3000
Charlotte, NC 28202
  *Counsel for Epsilon Energy USA, Inc.*

Richard L. Armezzani
Daniel T. Brier
John B. Dempsey **[ARGUED]**
Nicholas F. Kravitz
Myers Brier & Kelly
425 Biden Street

Suite 200
Scranton, PA 18503
     *Counsel for Chesapeake Appalachia, LLC*

———————

OPINION OF THE COURT

———————

MATEY, *Circuit Judge*.

"Law, in its most general and comprehensive sense, signifies a rule of action." 1 William Blackstone, Commentaries \*38 (George Sharswood ed., 1893) (1765). The Federal Rules of Civil Procedure are rules of action designed to secure the just and efficient determination of civil proceedings. And their joinder provisions promote the ancient balance among efficiency, fairness, and finality. These concerns compete in a dispute between Epsilon Energy USA, Inc. ("Epsilon") and Chesapeake Appalachia, LLC ("Chesapeake") about the terms of contracts for developing and operating natural gas projects. They disagree about the proper parties and whether missing members of the development deal leave the lawsuit incomplete and improper for decision.

Drawing on their classical roots, the Federal Rules direct courts to determine which parties are really needed, offering broad statements of principle that must be conscientiously construed, not rotely recited.[1] And while we

---

[1] *See* Fed. R. Civ. P. 1 (The rules "should be construed, administered, and employed by the court and the parties to

3

agree with the District Court that the other contracting parties are required, deciding whether to proceed without those that cannot be joined involves further findings better performed by the trial judge. So we will vacate and remand for further consideration.

## I.

Epsilon, an Ohio corporation with a principal place of business in Texas, entered into several Joint Operating Agreements ("JOAs") with oil and gas companies, including Chesapeake, a limited liability company whose sole member is an Oklahoma citizen, to develop natural gas in Pennsylvania.[2] The JOAs designate Chesapeake as the "Operator," requiring Chesapeake to "conduct and direct and have full control of all operations on the Contract Area." App. 390. Chesapeake can be removed as Operator only for good cause by an affirmative vote of the other JOA parties.

---

secure the just, speedy, and inexpensive determination of every action."); *see also* 1 William Blackstone, Commentaries *61 ("[S]ince in laws all cases cannot be foreseen or expressed, it is necessary that, when the general decrees of the law come to be applied to particular cases, there should be somewhere a power vested of defining those circumstances, which (had they been foreseen) the legislator himself would have expressed.").

[2] The other parties to the JOAs include Equinor USA Onshore Properties, Inc. f/k/a Statoil USA Onshore Properties, Inc. ("Equinor"); Jamestown Resources, LLC; Chief Exploration & Development, LLC; Enerplus Resources (USA) Corporation; Radler 2000 Limited Partnership; Tug Hill Marcellus, LLC; and Unconventionals Natural Gas, LLC.

4

The JOAs allow the "Non-Operator parties" to propose new well sites for development. App. 392. Everyone else then has thirty days to decide whether they want to participate. If a proposal receives less than unanimous support, Article VI.2(a) of the JOAs says the "party or parties giving the notice and such other parties as shall elect to participate in the operation shall, no later than ninety (90) days after the expiration of the notice period[,] . . . actually commence the proposed operation and complete it with due diligence." App. 393. The work is ordinarily performed by Chesapeake as the Operator on behalf of the participants known as the "Consenting Parties." App. 393. But if Chesapeake is not on board with the project, Chesapeake becomes a "Non-Consenting Party," and the Consenting Parties "designate one of the Consenting Parties as Operator to perform such work." App. 393.

The plan on paper ran into problems in practice when Chesapeake opposed wells proposed by Epsilon. *See Epsilon Energy USA, Inc. v. Chesapeake Appalachia, LLC*, No. 3:18-cv-01852 (M.D. Pa. Sept. 20, 2018). The parties settled their dispute and agreed that Epsilon could recommend new wells under the JOAs "in accordance with the terms of the JOAs." App. 447. And if Chesapeake did not consent to a proposal and did not agree to act as the Operator, then Chesapeake would "cooperate with the party designated, to the extent permitted under the JOA, as [O]perator" and would "not unreasonably withhold cooperation." App. 447.

The new plan worked as well as the old one, and another quarrel arose when Epsilon proposed wells on a site known as the Craige Well Pad. Chesapeake opposed the idea and refused to participate or serve as Operator. And Chesapeake also blocked Epsilon from operating the proposed project, arguing

5

Epsilon could not unilaterally operate a new well. Chesapeake then proposed a different project (the Koromlan Well), which directly conflicted with Epsilon's Craige concept. So Epsilon sued, seeking, among other relief, a declaration to drill the Craige Wells without Chesapeake's participation. *See Epsilon Energy USA, Inc. v. Chesapeake Appalachia, LLC*, No. 1:21-cv-00658 (M.D. Pa. Apr. 9, 2021).

Chesapeake moved to dismiss the suit for failure to join the other co-signatories to the JOAs ("Absent JOA Parties") under Federal Rule of Civil Procedure 12(b)(7). The District Court denied that motion, but then granted Chesapeake's motion to dismiss for failure to state a claim. Epsilon moved for partial reconsideration of its declaratory judgment claim, which was denied. Both parties now appeal.[3]

---

[3] As pled, the District Court had subject-matter jurisdiction under 28 U.S.C. § 1332(a) because Epsilon is an Ohio corporation with its principal place of business in Texas, and Chesapeake is a limited liability company whose sole member is an Oklahoma citizen. But at least one of the Absent JOA Parties, Equinor, is a citizen of Texas, a fact that may impact the District Court's decisions on remand. We have jurisdiction under 28 U.S.C. § 1291 and review the determination of necessary parties under Rule 19 for an abuse of discretion. *Gardiner v. V.I. Water & Power Auth.*, 145 F.3d 635, 640 (3d Cir. 1998).

## II.

The text of Rule 19 governs joinder, but solving its puzzles requires consulting history, context, and the reason behind the Rule.[4]

## A.

Federal Rule of Civil Procedure 19(a) describes "Persons Required to Be Joined if Feasible." It then defines a "Required Party" in terms of jurisdictional prerequisites followed by prudential considerations. For starters, a required party may only be "[a] person who is subject to service of process and whose joinder will not deprive the court of subject-matter jurisdiction." Fed. R. Civ. P. 19(a)(1). Then the Rule adds a layer of requirements. Assuming jurisdiction, an absent person becomes a required party only when: 1) "the court cannot accord complete relief" without him, *id.* at 19(a)(1)(A);

---

[4] *See* 1 Blackstone, Commentaries *60 ("[T]he most universal and effectual way of discovering the true meaning of a law, when the words are dubious, is by considering the *reason* and *spirit* of it; or the cause which moved the legislator to enact it."). A process dating to the Founding when all legal interpretation was viewed "as a process of discovery" to find the law's reason, drawing on a "bundle of interpretive principles" like Blackstone's that informed the American legal tradition. Robert Lowry Clinton, *The Supreme Court Before John Marshall*, 27 J. Sup. Ct. Hist. 222, 228–29 (2002); *see also* Adrian Vermeule, Common Good Constitutionalism 9–11 (2022) (This "need for determination arises when principles of justice are general and thus do not specifically dictate particular legal rules.").

or 2) "that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may . . . as a practical matter impair or impede the person's ability to protect the interest; or . . . leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest," *id.* at 19(a)(1)(B).

Translated, there are some persons, real or corporate, not a party to a suit who, for prudential reasons, should be joined in an action. Perhaps their absence prevents a court from awarding full relief to the existing parties. Or they claim to have an interest in the dispute that will be harmed by a judgment. Or a bit of both scenarios, meaning a judgment in their absence will create inconsistent obligations and still more litigation. If a federal court has power over these persons—that is, if they meet the jurisdictional prerequisite—they are "required" missing parties and must be joined. So far, so good.

But what about persons who satisfy the prudential considerations in Rule 19(a)(1)(A) or (B) but not the jurisdictional prerequisite in 19(a)(1)? Their absence harms them or the existing parties, but they cannot be joined. *See* Fed. R. Civ. P. 82. That leaves the trial court with an action half-full—the sort of case or controversy Rule 19 seeks to avoid. Should the rest of the matter continue without the missing members?

Rule 19(b), under the heading "When Joinder Is Not Feasible," says "[i]f a person who is required to be joined if feasible cannot be joined, the court must determine whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed." Fed. R. Civ. P.

19(b). But who exactly is "a person who is required to be joined if feasible"? The language appears to direct the reader back to Rule 19(a), given its heading "Persons Required to Be Joined if Feasible." But reading Rule 19(b) to apply only to persons who satisfy all of Rule 19(a)'s jurisdictional and prudential components makes little sense since they already "must be joined as a party," Fed. R. Civ. P. 19(a)(1), leaving Rule 19(b) with nothing to do.[5]

So courts have gravitated toward a second reading, one where Rule 19(b) applies to persons who *would* satisfy the prudential considerations in (a)(1)(A) and (B) setting aside any jurisdictional problems. A sensible approach that, alas, requires some imaginative redlining. Such as: "If a person who [would be provisionally] required to be joined [under Rule 19(a)(1)(A) or (B)] if feasible but cannot be joined [because the person is not subject to service of process or his joinder would deprive the court of subject-matter jurisdiction], the court must determine whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed." Fed. R. Civ. P. 19(b).

---

[5] Scholars have pointed out the awkward wording and structure of Rule 19. *See, e.g.*, Richard D. Freer, *Rethinking Compulsory Joinder: A Proposal to Restructure Federal Rule 19*, 60 N.Y.U.L. Rev. 1061, 1076–77 & n.76 (1985) ("The rule is poorly drafted. The first step in resolving any compulsory joinder issue is the identification of absentees to be joined. Rule 19, however, appears to indicate that the first step is ascertaining whether joinder is feasible."); *W. Md. Ry. Co. v. Harbor Ins. Co.*, 910 F.2d 960, 962 n.5 (D.C. Cir. 1990) (citing and quoting Freer).

Faced with two possible readings—one inside the text but useless in practice, the other practical but outside the text—we turn to the historical roots of joinder for clarity. The goal of our inquiry, as always, is to give effect to the rule maker's aim.[6] *See Brown v. Barry*, 3 U.S. (3 Dall.) 365, 367 (1797). A task aided by determining "how a reasonable person, conversant with the relevant social and linguistic conventions, would read the text in context." *Madrid-Mancia v. Att'y Gen.*, 72 F.4th 508, 518 (3d Cir. 2023) (citation omitted).

**B.**

Words in a Rule, like words in a statute, may be "obviously transplanted from another legal source, whether the common law or other legislation." Felix Frankfurter, *Some Reflections on the Reading of Statutes*, 47 Colum. L. Rev. 527, 537 (1947). That "old soil" provides necessary background that informs the meaning of the new law. *Id.*; *see also* Sir Edward Coke, 2 Institutes of the Laws of England 307 (1797 ed.) (1642) ("To know what the common law was before the making of any statute (whereby it may be known whether the act be introductory of a new law, or affirmatory of the old) is the very lock and key to set open the windows of the statute . . . ."). Rule 19(b) carries an obvious transplant: the instruction that courts resolve joinder questions "in equity and good conscience." Fed. R. Civ. P. 19(b). Indeed, the whole of Rule 19 boasts a long provenance.

---

[6] We interpret the Federal Rules of Civil Procedure like any posited law. *See Elliott v. Archdiocese of New York*, 682 F.3d 213, 225 (3d Cir. 2012).

The notion that some parties should be added to an action traces to Lord Nottingham, "the Father of Modern Equity." 6 William Holdsworth, A History of English Law 548 (1924). He solidified the idea "that all persons having an interest in the controversy ought to be parties," a determination he tied to "practical considerations of fairness and expediency."[7] Geoffrey C. Hazard, Jr., *Indispensable Party: The Historical Origin of a Procedural Phantom*, 61 Colum. L. Rev. 1254, 1257 (1961).[8] Just as Rule 19(b) acknowledges that a case should proceed without the desired party in some cases, the court customarily excused joinder when it was "impossible, inconvenient, or unduly burdensome." *Id.* at 1260–61.

Then a new principle emerged in the late eighteenth century: that a court of equity "should do 'complete' justice or none at all." *Id.* at 1271. This idea found form in *Fell v. Brown*, 29 Eng. Rep. 151 (Ch. 1787), a decision that quickly "became the leading case on indispensability." Hazard, *supra*, at 1274. In that case, the Chancellor deemed it "impossible" to proceed

---

[7] These considerations included "avoidance of a multiplicity of actions, assurance of adequate presentation of the issues and relevant evidence, efficient use of judicial effort, and avoidance of inconsistent adjudication between different parties to the transaction." Geoffrey C. Hazard, Jr., *Indispensable Party: The Historical Origin of a Procedural Phantom*, 61 Colum. L. Rev. 1254, 1257–58 (1961). And they bear a striking similarity to the factors contained in today's version of Rule 19(b). *See* Fed. R. Civ. P. 19(b).

[8] The Advisory Committee to Rule 19 cited Hazard's *Indispensable Party* when discussing defects in the original Rule and the "older equity practice." *See* Fed. R. Civ. P. 19 advisory committee's note to 1966 amendments.

without joining parties because their absence precluded the court's ability to issue a "perfected" decree. *Fell*, 29 Eng. Rep. at 153. But the action was not dismissed; it was stayed on the suggestion that the interested party was expected to be available. *Id.* Even so, this dictum did its damage: the indispensable party rule became known as "a rule of long standing." *Palk v. Clinton*, 33 Eng. Rep. 19, 23 (Rolls 1805).

*Fell*'s dictum became doctrine in America.[9] The indispensable party rule found special solace in federal practice because many state courts lacked equity jurisdiction at the beginning of the nineteenth century. *See* Hazard, *supra*, at 1277. But sometimes the rule ran headlong into the diversity requirement, leaving litigants stranded without any forum—a result tough to square with the pragmatic, flexible origins of the indispensable party rule. Then the Supreme Court added to the muddle by crafting two categories of absent parties: those who are "necessary" and, as a subset, those who are "indispensable." *See Shields v. Barrow*, 58 U.S. (17 How.) 130, 139 (1854). But *Shields*'s new "necessary" and "indispensable" categories came without instructions. *See* John W. Reed, *Compulsory Joinder of Parties in Civil Actions*, 55 Mich. L. Rev. 327, 355 (1957) (calling *Shields*'s guidance

---

[9] *See* Joseph Story, Commentaries on Equity Pleadings § 77, at 78 (2d ed. 1840) ("[I]f complete justice between the parties before the Court cannot be done without other parties being made, whose rights or interests will be prejudiced by a decree; then the Court will altogether stay its proceedings, even though those other parties cannot be brought before the Court . . . ."); *Joy v. Wirtz*, 13 F. Cas. 1172, 1173 (C.C.D. Pa. 1806) (No. 7554) (Washington, J.) (adopting *Fell*'s "rule" that certain parties "cannot be dispensed with").

"shoddy and unimaginative"). And the classical equitable analysis devolved into rigid conceptions of the separability of parties' rights and interests. 7 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1601 (3d ed. 2023). No help arrived in the 1938 adoption of Rule 19 which codified the terminology and fueled the "unfortunate" view that the absence of an indispensable party divested the court of jurisdiction.[10] *See* Benjamin Kaplan, *Continuing Work of the Civil Committee: 1966 Amendments of the Federal Rules of Civil Procedure (I)*, 81 Harv. L. Rev. 356, 363–64 (1967).

As has often occurred, "[e]quity provided motivation for fresh enactments in the law."[11] And after much criticism, the Advisory Committee overhauled Rule 19, conceding that the 1938 version "was defective in its phrasing and did not point clearly to the proper basis of decision." Fed. R. Civ. P. 19 advisory committee's note to 1966 amendment. By codifying specific considerations that courts should examine in each case, the Committee hoped to shift the focus onto "the pragmatic considerations which should be controlling," and away from the "technical or abstract character of the rights or obligations of the persons whose joinder was in question." *Id.*

---

[10] Our Court stuck with the jurisdictional theory of mandatory joinder even after commentary to the 1966 amendments expressly disavowed the practice. *See Provident Tradesmens Bank & Tr. Co. v. Lumbermens Mut. Cas. Co.*, 365 F.2d 802, 811–14 (3d Cir. 1966). The Supreme Court quickly corrected that course. *See Provident Tradesmens Bank & Tr. Co. v. Patterson*, 390 U.S. 102, 119–21 (1968).

[11] R.H. Helmholz, Natural Law in Court: A History of Legal Theory in Practice 37 (2015) (citing Dig. 6.2.17 (Neratius, Membranae 3)).

13

A year after the amendment, the Supreme Court confirmed that Rule 19(b)'s factors "emphasize[] the pragmatic consideration of the effects of the alternatives of proceeding or dismissing, [whereas] the older version tended to emphasize classification of parties." *See Provident Tradesmens Bank & Tr. Co. v. Patterson*, 390 U.S. 102, 116 n.12 (1968). Disavowing the rigid, mechanical formula that characterized joinder before the 1966 amendments, it announced that the revised version of Rule 19(b) applies only "in the context of particular litigation" without using any "prescribed formula." *Id.* at 118 & n.14 (citation omitted). And it instructed courts to base their dismissal decisions on "factors varying with the different cases, some such factors being substantive, some procedural, some compelling by themselves, and some subject to balancing against opposing interests." *Id.* at 119. A directive that endures. *See Republic of Philippines v. Pimentel*, 553 U.S. 851, 862–63 (2008) ("The design of the Rule, then, indicates that the determination whether to proceed will turn upon factors that are case specific, which is consistent with a Rule based on equitable considerations."). And so, with the Rule's amendment and the Supreme Court's gloss, the joinder inquiry again functions much like it did in equity.

### III.

With this context, the best reading of Rule 19 settles into three steps: 1) Considering the qualifications under Rule 19(a)(1)(A) and (a)(1)(B), should the absent party be joined?; 2) If so, is joinder feasible—that is, can the party be joined without depriving the court of the ability to hear the case?; 3) If joining the party is not feasible, should the action continue in the party's absence or be dismissed? *See Gen. Refractories Co.*

14

*v. First State Ins. Co.*, 500 F.3d 306, 312 (3d Cir. 2007); *Provident Tradesmens*, 390 U.S. at 108–09.[12]

### *Step One*: **Should the Absent JOA Parties be joined?**

Chesapeake confined its argument to Rule 19(a)(1)(B)(i): whether the party "claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may . . . as a practical matter impair or impede the person's ability to protect the interest." We do not have before us a non-party that "claims an interest," as the Absent JOA Parties have never offered a position. "When necessary, however, a court of appeals should, on its own initiative, take steps to protect the absent party, who of course had no opportunity to plead and prove his interest below." *Provident Tradesmens*, 390 U.S. at 111.[13]

---

[12] Although our precedents have sometimes collapsed the second question into the first or third, other courts have persuasively noted the three distinct inquiries. *See, e.g.*, *E.E.O.C. v. Peabody W. Coal Co.*, 400 F.3d 774, 779 (9th Cir. 2005); *Glancy v. Taubman Ctrs., Inc.*, 373 F.3d 656, 666 (6th Cir. 2004); *Citizen Potawatomi Nation v. Norton*, 248 F.3d 993, 997 (10th Cir. 2001). As then-Judge Thomas succinctly put it, "[w]hen a party to a federal lawsuit moves to join a nonparty resisting joinder, the district court must answer three questions: Should the absentee be joined? If the absentee should be joined, can the absentee be joined? If the absentee cannot be joined, should the lawsuit proceed without her nonetheless?" *W. Md. Ry.*, 910 F.2d at 961.

[13] We also note that district courts possess power to protect the interests of absent parties. *See United States v.*

15

As the District Court explained, parties owning rights under disputed contracts, like the Absent JOA Parties, generally have a legally protected interest under Rule 19(a)(1)(B)(i). *See, e.g.*, *E.E.O.C. v. Peabody W. Coal Co.*, 610 F.3d 1070, 1082 (9th Cir. 2010) (explaining the "underlying principle" that signatories to a contract have an interest in a lawsuit to set aside that contract); *Nat'l Union Fire Ins. Co. of Pittsburgh v. Rite Aid of S.C., Inc.*, 210 F.3d 246, 251 (4th Cir. 2000) ("As the contracting party," the absent party "has a direct interest in the district court's determination" of its contractual rights and obligations.); Story, Commentaries § 159, at 151 ("[I]n cases of joint interests, joint obligations and contracts, and joint claims, duties, and liabilities . . . the general rule is, that all the joint owners, joint contractors, and other persons, having a community of interests in duties, claims or liabilities, who may be affected by the decree, should be made parties."). Allowing Epsilon to drill the Craige Wells affects those interests. Some might earn a profit even without giving consent. Others might shoulder the losses of a wasted asset. And although the Absent JOA Parties are Non-Consenting Parties here, they could consent to a future proposal. A declaratory judgment interpreting the JOAs to authorize a single Consenting Party to propose the drilling of a new well would affect their interests. All making the Absent JOA Parties "necessary" under Rule 19(a).

---

*Shaknitz*, 2023 WL 4921841 (3d Cir. 2023); Fed. R. Civ. P. 1. So when it is "desirable to advise a person who has not been joined of the fact that the action is pending," a "court in its discretion may itself convey this information by directing a letter or other informal notice to the absentee." Fed. R. Civ. P. 19 advisory committee's note to 1966 amendment.

16

***Step Two*: Is joinder of the Absent JOA Parties feasible?**

The complete diversity of the parties takes center stage here. Some Absent JOA Parties, as the District Court noted, do not defeat complete diversity. And any necessary party for whom joinder is feasible *must* be joined, *see* Fed. R. Civ. P. 19(a)(1), a step required on remand for all Absent JOA Parties who can be feasibly joined. But other Absent JOA Parties are citizens of Texas who cannot be feasibly joined without defeating diversity and destroying subject matter jurisdiction. Bringing us to the final step of Rule 19.

***Step Three*: Does equity and good conscience require dismissal?**

The terms "equity and good conscience" are part of the equitable tradition that has "a high density of moral terms." Aditya Bamzai & Samuel L. Bray, *Debs and the Federal Equity Jurisdiction*, 98 Notre Dame L. Rev. 699, 707 (2022). While the words might appear to grant judges limitless power, they are merely, as then-Chief Judge Cardozo wrote, "signposts for the traveler" that have always guided judicial discretion.[14] *Evangelical Lutheran Church of the Ascension v.*

---

[14] *See, e.g.*, *United States v. Burr*, 25 F. Cas. 30, 35 (C.C.D. Va. 1807) (Marshall, C.J.) ("[A] motion to [a court's] discretion is a motion, not to its inclination, but to its judgment; and its judgment is to be guided by sound legal principles."). And these inherent limits necessarily follow from the original understanding that, as Chief Justice Marshall wrote, "[j]udicial power is never exercised for the purpose of giving effect to the

*Sahlem*, 172 N.E. 455, 457 (N.Y. 1930). In the antebellum Republic, courts used the terms "equity and good conscience" as guides for judging the priority of liens, *Brent v. Bank of Washington*, 35 U.S. (10 Pet.) 596, 615 (1836), the correctness of an arbitrator's special award, *Kleine v. Catara*, 14 F. Cas. 732, 735 (C.C.D. Mass. 1814) (Story, J.), and, as relevant here, whether a case should proceed without certain persons, *Shields*, 58 U.S. at 139.

Acknowledging this traditional discretion, the Rules Committee adopted "equity and good conscience" as signposts for determining whether an action "should proceed among the existing parties or should be dismissed." Fed. R. Civ. P. 19(b). That is, the Rule "is not content with a mechanical subsuming of particular instances under the general norm but allows equity to play its part." Heinrich A. Rommen, The Natural Law: A Study in Legal and Social History and Philosophy 188 (Thomas R. Hanley trans., 1998) (1936). Our analysis does not disturb that framework, and our discussion of the Rule 19(b) inquiry does not replace case-by-case consideration with a checklist. But, finding the District Court's explanation of the first two 19(b) factors wanting, we flag specific areas for reconsideration on remand.[15]

---

will of the Judge; always for the purpose of giving effect to the will of the Legislature; or, in other words, to the will of the law." *Osborn v. Bank of U.S.*, 22 U.S. (9 Wheat.) 738, 866 (1824).

[15] We note we are dealing with contracting parties, who have been described as "the paradigm of an indispensable party." *Gunvor SA v. Kayablian*, 948 F.3d 214, 221 (4th Cir. 2020) (quoting *Nat'l Union Fire Ins.*, 210 F.3d at 252). And

The first factor of Rule 19(b) weighs "the extent to which a judgment rendered in the person's absence might prejudice that person or the existing parties." Fed. R. Civ. P. 19(b)(1). As the District Court acknowledged, while this factor "overlaps considerably with the Rule 19(a) analysis," *Gardiner v. V.I. Water & Power Auth.*, 145 F.3d 635, 641 n.4 (3d Cir. 1998), a court must still evaluate how the absent parties will be affected by a judgment. Here, drilling the disputed wells could provide a windfall to the Absent JOA Parties or could waste their common assets. And an interpretation of the rights of both Consenting and Non-Consenting Parties under the JOAs could affect their and their business partners' behavior come the next drilling proposal. Though not insurmountable, these factors tip toward dismissal and must be considered.

---

the Absent JOA Parties are entitled under the JOAs to certain rights as Non-Operator, Non-Consenting Parties—making them, in important respects, contract obligees, who normally are indispensable. *See Janney Montgomery Scott, Inc. v. Shepard Niles, Inc.*, 11 F.3d 399, 408 (3d Cir. 1993); 7 Wright & Miller, *supra*, § 1613 ("Joint obligees . . . usually have been required to be joined under Rule 19(b) and their nonjoinder has led to a dismissal of the action.").

While relevant, the nature of the absent parties does not control the analysis: we evaluate parties under Rule 19(b) only after they are found necessary, and the 19(b) analysis hinges on "the pragmatic consideration of the effects of the alternatives of proceeding or dismissing" rather than the "classification of parties." *Provident Tradesmens*, 390 U.S. at 116 n.12. Courts must always decide whether to proceed in the party's absence case-by-case. *See Pimentel*, 553 U.S. at 862–63.

The District Court did not meaningfully consider these questions, concluding instead that positions of the Absent JOA Parties will be advanced by either Epsilon or Chesapeake. Perhaps, but if that alone were enough to satisfy Rule 19(b), many multi-party actions would automatically proceed despite the careful inquiry created in the Rule. Although the positions of the present parties are not irrelevant, more specific factual findings are necessary to determine if the absent parties have been "harmed by the judgment." *Provident Tradesmens*, 390 U.S. at 114. For instance, the District Court must address its earlier finding that the Absent JOA Parties have "taken divergent positions on whether to consent to the Craige Wells or the Koromlan Well." Dist. Ct. Dkt. No. 35 at 18. So too the limits of Epsilon's and Chesapeake's interpretations of the relevant contract provisions which are not exhaustive and could easily spill into other disputes. All reasons why, "without a perfect identi[t]y of interests, a court must be very cautious in concluding that a litigant will serve as a proxy for an absent party." *Tell v. Trs. of Dartmouth Coll.*, 145 F.3d 417, 419 (1st Cir. 1998) (citation omitted); *Nat'l Union Fire Ins.*, 210 F.3d at 251.

The second factor considers "the extent to which any prejudice could be lessened or avoided by: (A) protective provisions in the judgment; (B) shaping the relief; or (C) other measures." Fed. R. Civ. P. 19(b)(2). Epsilon seeks declaratory and injunctive relief, remedies impacting the rights and obligations of the Absent JOA Parties. The District Court noted that "a court granting such equitable remedies has wide discretion in determining the nature and scope of that relief." Dist. Ct. Dkt. No. 35 at 20. True enough, but the District Court did not describe how such discretion could be used to shape the

20

remedies to avoid or lessen prejudice here. Rule 19(b) requires more specificity. The District Court must do so on remand.

The District Court reasonably considered the last two factors, but we recount them here for further guidance. The third factor turns on "whether a judgment rendered in the person's absence would be adequate." Fed. R. Civ. P. 19(b)(3). In *Provident Tradesmens*, the Supreme Court read this factor as referring to the public stake in settling whole disputes, but it also considered whether a judgment would be adequate to the plaintiff, defendant, and nonparties. *See* 390 U.S. at 111–13. For this factor, a court must practically consider the likelihood of other suits. Dismissal is less appropriate where there is reason to believe multiple suits are unlikely or a consolidated suit would not settle all disputes.

Finally, the fourth factor weighs the prejudice to the existing plaintiff, asking "whether the plaintiff would have an adequate remedy if the action were dismissed for nonjoinder." Fed. R. Civ. P. 19(b)(4). Here, the most relevant question is whether the Pennsylvania Commonwealth courts remain available to resolve Epsilon's claims.

**IV.**

Having set forth more instruction on Rule 19, we will remand for the District Court to join the Absent JOA Parties over which there is jurisdiction and to reconsider whether to proceed in the absence of those who cannot be joined. We therefore do not reach the appeal of the motion to dismiss for failure to state a claim or the motion for reconsideration of the request for declaratory judgment.

21